Filed 7/12/13  In re A.C. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re A.C., a Person Coming Under the Juvenile Court Law. | H038820 (Santa Clara County Super. Ct. Nos. JD20320, JD20322) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES, Plaintiff and Respondent, v. ANA C., Defendant and Appellant. | |

Ana C. (mother) appeals from an order terminating reunification services and setting a selection and implementation hearing (Welf. & Inst. Code, § 366.26)[1] for her sons, five-year-old A.C. and two-year-old L.H.  She also appeals from an order denying her petition for modification pursuant to section 388.  She contends:  (1) the juvenile court abused its discretion when it denied her motion to continue the section 388 and section 366.26 hearing, and (2) there was insufficient evidence to support the finding that A.C. and L.H. were adoptable.  We find no error and affirm.

---

[1]     All further statutory references are to the Welfare and Institutions Code.

1

# I. Statement of Facts

On September 22, 2010, the Department of Family and Children's Services (Department) filed petitions alleging that three-year-old A.C., three-month-old L.H., and two-year-old V.C. came within the provisions of section 300, subdivisions (b) [failure to protect].[2] The petitions alleged: (1) the children were at significant risk due to repeated exposure to domestic violence between their mother and her boyfriend A.B., L.H.'s father, (2) the police responded numerous times to the family's home on domestic violence calls, (3) the mother exhibited symptoms of untreated mental health problems, (4) A.C. reported that his mother and A.B. regularly hit him on his head, torso, and buttocks with a belt, their hands and sandals, (5) the mother had a history of methamphetamine use and tested positive for methamphetamine in family court in 2009, and (6) the mother failed to acknowledge the danger that A.B. posed to her children. All three children were detained and supervised visitation was ordered for the mother.

In November 2010, the jurisdiction/disposition report was filed. The social worker recommended that the juvenile court take jurisdiction of the children, remove them from their mother's care, and provide the mother with reunifications services for A.C. and L.H. It was also recommended that V.C. be placed with her father under a plan of family maintenance.

According to the report, the mother went to the police station and stated that she had been a victim of domestic violence on September 19, 2010. A.B. had pushed her, repeatedly struck her head and arms, and scratched her shoulder with car keys. She also stated that A.B. had struck her three to four times in the last two years in her children's presence. A.B. was arrested and denied hitting or assaulting the mother. Four days later, the mother told the social worker that A.B. had never hit her before the September 19 incident, blamed herself for antagonizing him, and bailed him out of jail because she did not want him to lose his job. The mother also stated that she was diagnosed with bi-polar and anti-social personality disorders when she was 14 years old and acknowledged that

---

[2] V.C. was placed with her father under a program of family maintenance and is not part of this appeal.

she needed mental health treatment.  The mother told the social worker that she did not graduate from high school and had difficulty finding work because she was an undocumented immigrant.

In addition, the social worker reported that A.C. had excellent verbal skills and showed no signs of developmental delays.  However, he exhibited signs of emotional distress by expressing fear of being hit, crying often, and having nightmares.  L.H. was not showing any signs of emotional distress.  The mother visited her children twice a week for two hours.

The juvenile court found the allegations of the petitions, as amended, to be true and took jurisdiction of the children.  The disposition hearing for A.C. was continued so that paternity could be established.  The juvenile court adjudged L.H. a dependent of the court and ordered him removed from his mother's custody.  The juvenile court also ordered that reunification services be provided to the mother for L.H.  These services included:  (1) completion of a parent orientation class, a Basic Positive Parenting class, and a Parenting Without Violence class; (2) counseling to address issues of domestic violence and its impact on the family; (3) participation in a psychological evaluation and compliance with the recommendations of the evaluator; (4) attendance at a domestic violence victims' support group; and (5) visitation.

An interim review report was filed on December 15, 2010.  In an interview on November 18, 2010, the mother told the social worker that she wanted to reunify with her children and missed them deeply, but she did not believe that there was any domestic violence in her relationship with A.B.  However, the social worker attached a police report in which the mother told the police that A.B. had pushed her into a wall and injured her during the weekend of November 13-14, 2010.  The interim review report also indicated that the mother had completed the parent orientation class, did not receive a certificate of completion for the Basic Positive Parenting class, was awaiting enrollment for the Basic Parenting Class, was participating in counseling, had not yet had the psychological evaluation, and was attending a domestic violence victims' support group.  It was also reported that there were no problems with visitation.

3

At the dispositional hearing for A.C., the juvenile court adjudged him a dependent of the court and ordered him removed from his mother's care. The juvenile court also ordered that reunification services be provided to the mother for A.C. These services were similar to those offered in L.H.'s case.

In the report for the six-month review hearing for both children, the Department recommended that the juvenile court terminate reunification services for A.B. and continue reunification services for the mother. The report also stated that the mother continued to have contact with A.B. even though there was a no-contact restraining order. On January 18, 2011, the mother informed the social worker that she had left A.B. and was living with a friend. However, the mother and A.B. were involved in a physical and verbal domestic violence incident a few days later, and A.B. was arrested and charged with corporal injury on a spouse. After A.B. was released from custody, he went to the mother's residence on April 2, 2011, grabbed her by the throat and choked her. A.B. was arrested and charged with corporal injury on a spouse and violation of a protective order. On April 6, 2011, A.B. pushed the mother to the ground in a parking lot and she was injured. The social worker also spoke with A.B.'s probation officer Leslie Anaya a few weeks later. Anaya stated that during a meeting with A.B., A.B. received 14 calls on his cell phone from the mother. Anaya also stated that at A.B.'s criminal hearing on April 8, 2011, the mother "repeatedly plead[ed] with the Judge for a peaceful contact order, and even after the Court hearing was over, she wanted to meet with [A.B.] and waited for him in the lobby."

The report stated that the mother continued to attend individual therapy, had participated in a psychological evaluation, and had completed the domestic violence support group. The mother was also consistently visiting her children. The report indicated that both children were meeting developmental milestones. According to the foster parent, A.C. was no longer having nightmares or feeling afraid, and "always wants to help." L.H. was not showing any signs of emotional stress.

The six-month review hearing was held on April 28, 2011. The juvenile court ordered that the mother continue to receive reunification services for A.C. At A.B.'s request, a contested hearing was scheduled regarding L.H.

An addendum report dated June 16, 2011, stated that A.B. had been arrested on May 23, 2011. After the mother called A.B., they met at a park and A.B. began yelling at her.

In an addendum report dated August 4, 2011, the Department recommended that the court terminate reunification services for both the mother and A.B. The social worker had received a CD of 84 recorded telephone conversations between the mother and A.B., who was then incarcerated. A.B. was extremely verbally abusive to the mother and she continued to express her emotional dependence on him. The social worker also received a copy of the recorded window telephone visits between A.B. and the mother at the facility. During one of these visits, when A.B. became verbally abusive to the mother, she responded by telling him that she loved him, would wait for him, and apologized for upsetting him. At the end of the visit, they discussed "how much they love[d] each other and that they [would] be a family soon."

On September 22, 2011, the juvenile court held the contested hearing in L.H.'s case. The social worker testified as an expert in risk assessment, placement of dependent children, and assessment of domestic violence issues. She testified that A.B. had been charged in connection with four incidents of domestic violence involving the mother between November 2010 and May 2011. The social worker was no longer recommending reunification services for the mother because she had not adequately addressed domestic violence issues in her relationship with A.B. even though she had participated in three domestic violence support groups and individual therapy. The mother had also told the social worker several times that she would not leave A.B.

Following the hearing, the juvenile court terminated reunification services for both the mother and A.B. and set the matter for a section 366.26 hearing for L.H. on January 18, 2012.

5

In the report dated October 18, 2011, for the 12-month review hearing for A.C., the Department recommended termination of reunification services for the mother. A.C. continued to reside in a concurrent foster home with L.H. and to meet developmental milestones. He initially had difficulty transitioning to a Head Start program. However, he was very excited about the program after two weeks and was making new friends. On October 11, 2011, the foster parent contacted the social worker and expressed her concerns about A.C.'s emotional well-being. A.C. worried about having enough food, was jealous of L.H., became anxious before visits with his mother, and was mimicking A.B.'s behavior. The social worker referred A.C. for individual therapy.

According to the 12-month review report, the mother continued to participate in individual therapy and had participated in a psychological evaluation. The psychologist stated that the mother met the diagnostic criteria for "Amphetamine Dependence, sustained Full Remission, Depressive Disorder Not Otherwise Specified, and Histrionic Personality Disorder." However, the mother had not followed the psychologist's recommendation to participate in a medical evaluation.

On October 26, 2011, the mother did not appear for the 12-month review hearing regarding A.C. and the juvenile court denied the request for a continuance. The juvenile court terminated reunification services for the mother and set a section 366.26 hearing for February 22, 2012.

The child advocate for A.C. submitted a report in October 2011. He described A.C. as "pleasant," "sweet," "caring," "independent," and "responsible." A.C. interacted well with adults, but his interactions with children needed improvement at times.

The report for the section 366.26 hearing on January 18, 2012, stated that L.H. was a healthy and happy one-year-old child who was meeting developmental milestones. According to the social worker, the likelihood of adoption was high. The child advocate submitted a report and described L.H. as "thriving in his current environment" and "a typical toddler [who] show[ed] no obvious ill effects of his situation."

On January 18, 2012, the Department requested a continuance of the section 366.26 hearing for L.H. The Department had identified adoption as the permanent plan

and sought additional time to identify a prospective adoptive family. L.H.'s current placement had previously been identified as a concurrent adoptive home. However, on November 21, 2011, the foster parent had reported that she could not be the concurrent home due to "personal reasons that included not wanting to be involved with L.H.'s biological family's reactions to the plan of adoption." The mother, who was present, did not object to the request. The juvenile court continued the section 366.26 hearing to May 10, 2012.

The report for the section 366.26 hearing for A.C. also recommended adoption as the permanent plan and requested a continuance to identify a prospective adoptive family. For the same reasons that were given in L.H.'s case, the foster parent for A.C. had reported that she could not be the concurrent home. The social worker stated that A.C. appeared to be "developmentally on target," and a "very intelligent, vocal, friendly and nurturing boy." Based on these qualities, the social worker stated that the likelihood of adoption for A.C. was high. His Head Start teacher described him as a "smart little boy," that is, "whatever they [taught him], he [understood] the concept." He also shared his knowledge with staff and peers. The teacher reported that A.C.'s behavior had improved a lot since August 2011 when he first started the Head Start program. He no longer pushed or hit his classmates and he followed directions.

An initial mental health assessment on February 9, 2012, stated that A.C. "present[ed] with irritability, sleep disturbance, restlessness, anger, and anxious thoughts." A.C. expressed anxiety about when he would see his mother again and if he would be reunified with her. He also expressed sadness about not seeing V.C. on a regular basis. In addition, A.C. was reenacting the domestic violence that he had witnessed by playing rough with adults and telling them "it's okay, it won't hurt," and becoming angry when they told him to stop. According to the assessor, A.C. was "on target in all areas of physical and socio-emotional development" and was a "very caring, friendly, insightful, and creative" boy, who "openly engages with peers and adults." The assessor concluded that his symptoms were demonstrated after he visited his mother, and her inconsistent attendance at supervised visits contributed to his anxiety. A.C. was also

7

worried about being separated from V.C. and his current foster parent, and he struggled with adjusting to having strong attachments to both his biological family and his current foster family. Thus, the assessor diagnosed him with adjustment disorder with anxiety. The assessor recommended that he continue with therapeutic services to cope with his current symptoms and to provide support for the transition to a new home.

The child advocate for A.C. prepared a report in which he stated that A.C. was "an extraordinary child," had "great potential," and was "a sweet and adorable boy." A.C. enjoyed living in the same house as L.H. and often asked if L.H. could accompany them on their outings. A.C. had become more comfortable interacting with other children his age and interacted well with adults. He was very imaginative, could sing the alphabet, count to 16, and had a good sense of time and the days of the week. The child advocate also described him as an "enjoyable child to be around."

At the section 366.26 hearing on February 22, 2012, the Department identified adoption as the permanent plan and requested a continuance to locate A.C.'s father. The juvenile court continued the matter to May 24, 2012.

An addendum report dated April 27, 2012, recommended that the mother's parental rights be terminated as to L.H. The social worker was assessing the home of the maternal grandmother, who was interested in adopting L.H. and A.C. Though the maternal grandmother did not have a criminal record or substantiated child protective services allegations against her, there was a history of concerns regarding her reactions to the mother and the social worker needed additional time to complete the relative assessment. The maternal aunt had reported that she could not provide a placement for the boys.

On May 10, 2012, the mother was present at the continued section 366.26 hearing for L.H. After the mother requested a contested hearing, the matter was continued to June 7, 2012.

An addendum report dated May 23, 2012, for the continued section 366.26 hearing for A.C. recommended termination of parental rights and the selection of adoption as the

8

permanent plan. The social worker had not completed her assessment of the maternal grandmother and requested a continuance to identify a prospective adoptive family.

On May 24, 2012, the mother was present at the continued section 366.26 hearing for A.C. She requested a contested hearing, and the matter was scheduled for June 7, 2012.

On June 7, 2012, the same day of the scheduled contested hearing for both children on the section 366.26 recommendations, the mother filed a section 388 petition in which she requested the return of both children to her care with family maintenance services. She alleged that she was supporting herself as an office assistant, living in a suitable place for her children, no longer responding to A.B.'s attempts to contact her, and participating in counseling, parenting classes, and support groups. She also alleged that it was best for her children to be returned to her care because the Department had not yet identified a concurrent home for them. The juvenile court then scheduled the contested section 366.26 hearing for both children as well as the hearing on the mother's section 388 petition for August 23, 2012.

On August 23, 2012, the Department submitted its report in response to the mother's section 388 petition. The social worker stated that she did not have verification of the mother's employment or her participation in therapy or other information provided in her petition. On June 7, 2012, the mother told the social worker that her therapist had informed her that she did not need any further treatment, and consequently she was no longer participating in therapy. The mother had also not been available for an in-person visit with the social worker at her residence.

The report summarized the mother's contacts with the Department during July and August 2012. On July 17, 2012, the mother left a message with the social worker that she had a family emergency, was cancelling a visit with her children, and would be back on July 20, 2012. On July 27, 2012, the mother called the social worker and reported that she went to Mexico to take care of "the mother of her mother" and that she would be getting a passport in one week. She was unable to provide the address where she was staying in Mexico. On August 5, 2012, the mother called the social worker and indicated

9

that she was aware of the hearing on August 23, 2012. She also reported that she was going to a psychiatrist in Mexico and was prescribed medication, which she was taking. Though A.B. had been deported to Mexico, the mother denied that she had had any contact with him. On August 16, 2012, the mother left a voicemail message stating that she was in Mexico and her documents were being delayed. She asked if the court could reschedule her hearing. On August 20, 2012, she left another voicemail message for the social worker in which she stated that she was on her way to San Jose.[3] On August 22, 2012, the mother reported that she was in San Diego, had been given a visa and passport, and was trying to make it to San Jose prior to the August 23, 2012 hearing.

The report also stated that the mother had consistently visited her children until July 16, 2012. After that date, the mother had Skype visits with the children, but it was confusing for A.C. to see his mother over the internet. During the period when the mother was not visiting, A.C. did not ask for her and his behavior did not change.

According to the social worker, the maternal grandmother had been eliminated as a possible placement for the children. A prospective adoptive home was later identified and the first pre-placement visit was scheduled for August 24, 2012. However, a paternal aunt of L.H. had then asked to be considered for placement of the children. The social worker intended to assess the paternal aunt and, if she were approved, the children would be placed with her. If not, the children would be placed with the identified prospective adoptive home.

On August 23, 2012, the mother did not appear for the hearing. The mother's counsel requested a continuance. The mother had contacted her counsel "a few hours" earlier and stated that she was "currently on a Greyhound bus from San Diego to San Jose

---

[3]     However, on August 21, 2012, the maternal grandmother contacted the social worker and reported that when the mother received a credit card, she would have the money to return to the United States. The maternal grandmother did not know why the mother went to Mexico. According to the maternal grandmother, the mother and her grandmother "do not have close contact because [the mother's grandmother] does not want 'problems.'"

and . . . that she [would] be arriving tomorrow in San Jose . . . ." The juvenile court then continued the matter to August 29, 2012.

On August 29, 2012, the mother did not appear for the hearing. The mother's counsel again requested a continuance, stating that the mother "believe[d] that she could be here within approximately two weeks." The juvenile court denied the request and stated: "There is not good reason nor good cause to continue the proceedings further. [¶] I do believe that under the totality of the circumstances and based on my understanding of evidence that is likely to be received today that continuing these proceedings any further and delaying these decisions would not be in the best interests of the children and that the Court should move forward with the underlying proceedings."

After reviewing the child advocates' reports and the Department's reports, the juvenile court denied the mother's section 388 petition. The juvenile court found: (1) there were no changed circumstances, and (2) it was not in the children's best interests to be returned to her care "given her instability, poor decision making and apparent lack of any insight into the issues that brought her and her children before the dependency court . . . ." The juvenile court also found that both children were likely to be adopted and, given their particular characteristic and qualities, they were very likely to be adopted in the reasonably near future. The juvenile court adopted the Department's recommended findings and orders as to both children and terminated the mother's parental rights.

## II. Discussion

### A.  Request for Continuance

The mother contends that the juvenile court abused its discretion when it denied her motion to continue the section 388 and section 366.26 hearing. She contends that she established good cause for a continuance because her "return from Mexico after a family emergency had been delayed due to immigration difficulties." She also asserts that "the unresolved placement issue had created its own delay," and thus the continuance would not have adversely affected the children.

"[N]o continuance shall be granted that is contrary to the interest of the minor. In considering the minor's interests, the court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements. [¶] Continuances shall be granted only upon a showing of good cause and only for that period of time shown to be necessary . . . ." (§ 352, subd. (a).) We review a juvenile court's denial of a motion for continuance under the abuse of discretion standard. (*In re Ninfa S.* (1998) 62 Cal.App.4th 808, 811.)

Here, the mother failed to establish good cause for a continuance. Though the mother had proper notice of the section 388 and section 366.26 hearings on August 23 and August 29, she apparently traveled to Mexico without the documentation necessary to return to the United States. Moreover, the mother was not credible. On August 22, she reported to the social worker that she had been given a visa and a passport, and the following day, she informed her counsel that she was "currently on a Greyhound bus from San Diego to San Jose." However, on August 29, she requested an additional two weeks without further explanation. The mother had also claimed that there had been a family emergency, yet the maternal grandmother told the social worker that the mother's grandmother did not want the problems associated with the mother. Based on this record, the mother failed to establish good cause for a continuance. Accordingly, the trial court did not abuse its discretion in denying the request.

### B. Finding of Adoptability

The mother next contends that there was insufficient evidence to support the adoptability finding. The mother argues that A.C. "was not generally adoptable because of his emotional and behavioral issues. Because of that, [L.H.] also was not generally adoptable because the two brothers, as a sibling set who had lived together a significant amount of time, needed placement together."

The juvenile court shall terminate parental rights if it "determines . . . by a clear and convincing standard that it is likely the child will be adopted." (§ 366.26,

12

subd. (c)(1).) "In making the determination of adoptability, the juvenile court 'must focus on the child, and whether the child's age, physical condition, and emotional state may make it difficult to find an adoptive family.' [Citation.] 'A child's young age, good physical and emotional health, intellectual growth and ability to develop interpersonal relationships are all attributes indicating adoptability.' [Citation.]" (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1526.)

"On review, we determine whether the record contains substantial evidence from which the juvenile court could find clear and convincing evidence the child was likely to be adopted within a reasonable time. [Citations.]" (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589.) Under this standard, "[w]e resolve all conflicts in favor of the respondent on appeal and give respondent the benefit of all legitimate and reasonable inferences. Where the facts reasonably support more than one inference, we may not substitute our judgment for that of the trier of fact. Considering only the evidence favorable to respondent, the question is whether that evidence is sufficient as a matter of law. If so, we must affirm the judgment. [Citations.]" (*In re Walter E.* (1992) 13 Cal.App.4th 125, 139-140.)

Here, five-year-old A.C. and two-year-old L.H. were young, physically healthy, and shared a close relationship. Neither child was developmentally delayed. L.H. had shown no signs of emotional distress. However, A.C. experienced symptoms of irritability, sleep disturbance, restlessness, anger and anxious thoughts, and he had reenacted the domestic violence that he had witnessed. Despite these symptoms, A.C. had many positive qualities indicating that he was adoptable. The mental health assessor described A.C. as a "very caring, friendly, insightful, and creative" boy, "who openly engages with peers and adults." The assessor also concluded that A.C. was "on target in all areas of physical and socio-emotional development." The Head Start teacher described A.C. as a "smart" boy, who shared his knowledge with peers and staff, and noted that his behavior had improved a lot. The child advocate for A.C. described him as "an extraordinary child," who was comfortable interacting with other children and adults. In the social worker's opinion, the likelihood of adoption was high for both L.H. and

A.C. Thus, even though A.C. had experienced emotional difficulties, there was substantial evidence to support the juvenile court's finding that it was likely that both children would be adopted.

Relying on *In re Kristin W.* (1990) 222 Cal.App.3d 234 and *In re Brian P.* (2002) 99 Cal.App.4th 616, the mother also argues that the social worker's opinion, by itself, was insufficient evidence to support a finding of adoptability. There is no merit to this argument. Here, evidence of the children's personal characteristics was provided by the child advocates, A.C.'s Head Start teacher, a mental health professional, the foster parent, and the social worker.

### III. Disposition

The orders are affirmed.

_____
Mihara, J.

WE CONCUR:

_____
Premo, Acting P. J.

_____
Grover, J.

14